530 F.2d 312
 91 L.R.R.M. (BNA) 2321, 78 Lab.Cas. P 11,235
 WINDSOR POWER HOUSE COAL COMPANY, a corporation, Appellee,
v.
DISTRICT 6 UNITED MINE WORKERS OF AMERICA, an Unincorporated
Labor Association, Appellant,
and
United Mine Workers of America, an Unincorporated
Association, et al., Defendants.
WINDSOR POWER HOUSE COAL COMPANY, a corporation, Appellee,
v.
UNITED MINE WORKERS OF AMERICA, an Unincorporated
Association, et al., Appellants.
 Nos. 75--1611, 75--1612.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1975.
Decided Feb. 3, 1976.
 
 Charles E. DeBord, II, John W. Cooper, Wellsburg, W. Va. (Pinsky, Mahan, Barnes, Watson, Cuomo & Hinerman, Wellsburg, W. Va., on brief), for appellants.
 Guy Farmer, Washington, D.C. (William A. Gershuny, Farmer, Shibley, McGuinn & Flood, Washington, D.C., Herbert G. Underwood, Steptoe & Johnson, Clarksburg, W. Va., on brief), for appellee.
 Before HAYNSWORTH, Chief Judge, and CRAVEN and WIDENER, Circuit Judges.
 CRAVEN, Circuit Judge:
 
 
 1
 On March 18, 1975, 'roving' pickets appeared at Windsor Power House Coal Company's Beech Bottom mine. Although not identified, it is clear that they were not members of Local 6362 of the United Mine Workers (the Beech Bottom mine local). Work at the mine stopped when members of the Local refused to cross this 'stranger' picket line.[1]
 
 
 2
 On March 27, 1975, Windsor brought suit under Section 301 of the National Labor Relations Act, as amended, 29 U.S.C. § 185, against the International Union, District 6, Local 6362, and various officers of the District and Local Union (hereinafter Union), seeking damages and temporary and permanent injunctive relief as a result of the Union's breach of 'no-strike' obligations under the 1974 National Bituminous Coal Wage Agreement. Judge Maxwell entered a temporary restraining order on the same day, ordering termination of the existing work stoppage and requiring the Union '(t)o honor the contract between the plaintiff and the (U.M.W.) and return to work . . ..' The order concluded:
 
 
 3
 It is further ORDERED that Windsor Power House Coal Company in accordance with the terms and conditions of the National Bituminous Coal Wage Agreement of 1974 shall arbitrate any grievance submitted by any member of the United Mine Workers employed at its Beech Bottom Mine.
 
 
 4
 By order entered April 7, the TRO was extended until April 17 at 5:00 p.m.
 
 
 5
 The work stoppage continued in spite of entry of the TRO, and on April 9 the court ordered the Union to show cause why it should not be held in contempt for failing to obey the temporary restraining order. A hearing on both the show cause order and Windsor's motion for a preliminary injunction was begun on April 15. Extensive hearings were held, and on April 17 the district court entered orders on both matters.
 
 
 6
 The contempt order[2] provided in relevant part:
 
 
 7
 (If defendants) do not fully comply with the provisions of the temporary restraining order of March 27, 1975, and the extension thereof, on or before 8:01 a.m., on April 18, 1975, and return to work, said United Mine Workers of America is hereby ORDERED assessed the sum of $10,000.00 for each and every shift of work missed at the Beech Bottom Mine of Windsor Power House Coal Company by reason of the strike or walkout threat when work is scheduled and available at said mine; that District 6 United Mine Workers is hereby ORDERED assessed the sum of $5,000.00 for each such shift on the identical conditions; and that Local 6362 is hereby ORDERED assessed the sum of $100.00 per each such shift upon the identical conditions.[3]
 
 
 8
 The preliminary injunction entered later on the same afternoon recited substantially the same terms as the TRO, except that the district court, apparently by inadvertence, failed to repeat the requirement that the company agree that all disputes be submitted to arbitration.[4]
 
 
 9
 The Union took this appeal from both the contempt order and the preliminary injunction.I.
 
 The Preliminary Injunction
 
 10
 The basic issue presented in this appeal concerning the preliminary injunction is whether, under the rule of law laid down in Boys Markets,[5] the refusal of the members of Local 6362 to cross a stranger picket line falls within the mandatory arbitration clause of its labor contract with Windsor and, as a result, is subject to injunction by the federal courts. We have held that the principle of Boys Markets may extend to such disputes, depending upon the contract's language. Armco Steel Corp. v. United Mine Workers, 505 F.2d 1129 (4th Cir. 1974), cert. denied, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975); Monongahela Power Co. v. Electrical Workers Local 2332, 484 F.2d 1209 (4th Cir. 1973). See also Island Creek Coal Co. v. United Mine Workers, 507 F.2d 650 (3d Cir. 1975), cert. denied, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975); NAPA Pittsburg, Inc. v. Automotive Chauffeurs Local 926, 502 F.2d 321 (3d Cir.) (en banc), cert. denied, 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed. 644 (1974). But see United States Steel Corp. v. United Mine Workers, 519 F.2d 1236 (5th Cir. 1975); Buffalo Forge Co. v. United Steelworkers, 517 F.2d 1207 (2d Cir. 1975); Note, Injunctions--Federal Courts May Enjoin Work Stoppage When Its Legality Is Arbitrable Issue, 88 Harv.L.Rev. 463 (1974).
 
 
 11
 Furthermore, in Armco Steel, supra, we held that just such a failure to cross a stranger picket line was within the mandatory arbitration clause of the 1971 National Bituminous Coal Wage Agreement. See also Island Creek, supra. We have not found, and neither party to this appeal has suggested, any material difference between the relevant provision of the 1971 labor contract and a similar provision of the 1974 Agreement.[6] We adhere to our prior decisions.
 
 
 12
 Secondly, the Union urges that the conduct of its members came within the 'Preservation of Individual Safety Rights' provision of the 1974 contract[7] and that this clause is a specific exception to the implied no-strike provisions of the Agreement. We are inclined to think that the Preservation of Individual Safety Rights was designed and intended to establish a procedure for correcting dangerous working conditions in the mines and has nothing to do with picketing. It is true, as the Union suggests, that crossing a picket line may provoke violence. But that does not appear to be among the dangers for which the procedure was designed. We need not, however, decide the question because it is clear that the procedure established by the safety rights clause was not invoked here.
 
 
 13
 The 'Preservation of Individual Safety Rights' provision of the labor agreement sets out a detailed procedure for asserting such rights: (1) 'When an Employee in good faith believes that he is being required to work under (abnormally and immediately dangerous) conditions he shall notify his supervisor of such belief.' (2) If there is no dispute between the Employee and management as to the existence of the dangerous condition, 'steps shall be taken immediately to correct or prevent exposure to such condition.' (3) 'If the condition is disputed, the Employee shall have the right to be relieved from duty on the assignment in dispute (and) . . . at least one member of the Mine Health and Safety Committee shall review such condition with mine management with four (4) hours to determine whether it exists.' (4) 'For disputes not otherwise settled, a written grievance may be filed, and the dispute shall be referred immediately to arbitration.'
 
 
 14
 There is nothing in the record to indicate that any member of the Union ever invoked this provision by bringing the issue to the attention of Windsor in the manner required. Cf. Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 383--84, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). We, therefore, hold that the preliminary injunction issued properly.
 
 II.
 The Contempt Order
 
 15
 For purposes of this appeal, the effect of the contempt order is determinable by whether is is characterized as criminal or civil in nature. If it is criminal contempt, it is properly before us on appeal and must be reversed because the court failed to afford the Union the panoply of rights available to defendants in criminal proceedings. If it is civil contempt, it is not appealable "except in connection with appeal from a final judgment in the main action." Carbon Fuel Co. v. United Mine Workers, 517 F.2d 1348, 1349 (4th Cir. 1975).
 
 
 16
 In Carbon Fuel, supra, we defined civil contempt as follows:
 
 
 17
 Civil contempt, on the one hand, is "wholly remedial,' serves only the purpose of a party litigant, and is intended to coerce compliance with an order of the court or to compensate for losses or damages caused by non-compliance.'
 
 
 18
 517 F.2d at 1349. The definition has two parts: (1) civil contempt is forward-looking, 'terminable if the contemnor purges himself of the contempt' and (2) it is "compensatory' of any losses sustained by the (injured party) as a result of the contempt.' Id. at 1349--50.
 
 
 19
 Clearly Judge Maxwell's order satisfied the first part of the test--it was prospective in application. The fine for contempt was to begin accruing only if workers did not return to work at the 8:01 a.m. shift on April 18, and it increased in amount only as each succeeding shift failed to resume work.
 
 
 20
 However, it is not clear that the court's order was intended to compensate Windsor for its losses as a result of the contempt. The total daily fines amounted to approximately $45,000, and the record contains no "evidence of complainant's actual loss" which approached that figure.[8] See Carbon Fuel, supra at 1350. Furthermore, the payment of the fine was to be made here to the clerk of court, not Windsor, which we specifically identified in Carbon Fuel as a characteristic of criminal contempt.
 
 
 21
 Windsor has represented to this court, both in its brief and at oral argument, that the contempt order is not final. It contends that in subsequent proceedings the fine's payment may be directed to Windsor and adjustment may be made in its amount to match the contemnor's conduct. We do not understand the Union to dispute these contentions. Accordingly, we hold that the court's order is civil in nature and presently not appealable.
 
 
 22
 On remand, the district court will treat its contempt order as tentative and, in an effort to balance all pertinent factors to achieve a fair and just result, will carefully consider both the actual damages incurred by Windsor during the period from entry of the contempt order until work was resumed and the character of the efforts made by the Union and others to achieve compliance.[9]
 
 
 23
 Affirmed in part, vacated, and remanded.
 
 
 
 [1]
 The picketing was occasioned by a labor dispute between another coal company and other locals and did not relate to the Windsor operation
 
 
 [2]
 Both the contempt order and the preliminary injunction were entered orally on April 17. These orders were reduced to writing and formally entered on April 22
 
 
 [3]
 App. 31--32. See also App. 303
 
 
 [4]
 Under Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the district court as a condition to granting any injunction must make a finding that the 'strike' is "over a grievance which both parties are contractually bound to arbitrate . . .." Id. at 254, 90 S.Ct. at 1594. While the district court's preliminary injunction order does not contain such a finding, upon reviewing the record of the entire proceedings it is clear that he made such a finding. See App. 332--38
 Omitting the requirement that the company accede to arbitration is not significant in view of the finding and the company's willingness to arbitrate. See Inland Steel Co. v. Mine Workers Local 1545, 505 F.2d 293, 300 (7th Cir. 1974).
 
 
 [5]
 Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)
 
 
 [6]
 The jurisdictional language for arbitration cases in the 1974 Contract is found in Article XXIII § (c). It reads, in relevant part, as follows:
 Should differences arise between the Mine Workers and the Employer as to meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time (in accordance with the Agreement's grievance-arbitration procedures).
 
 
 [7]
 Article III, Section (i) of the 1974 Agreement provides in pertinent part:
 Section (i) Preservation of Individual Safety Rights
 (1) No Employee will be required to work under conditions he has reasonable grounds to believe to be abnormally and immediately dangerous to himself beyond the normal hazards inherent in the operation which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated. When an Employee in good faith believes that he is being required to work under such conditions he shall notify his supervisor of such belief. Unless there is a dispute between the Employee and management as to the existence of such condition, steps shall be taken immediately to correct or prevent exposure to such condition utilizing all necessary Employees, including the involved Employee.
 (2) If the existence of such condition is disputed, the Employee shall have the right to be relieved from duty on the assignment in duspute. Management shall assign such Employee to other available work not involved in the dispute; and the Employee shall accept such assignment at the higher of the rate of the job from which he is relieved and the rate of the job to which he is assigned. The assignment of such alternative work shall not be used to discriminate against the Employee who expresses such belief. If the existence of such condition is disputed, at least one member of the Mine Health and Safety Committee shall review such condition with mine management within four (4) hours to determine whether it exists.
 (4) For disputes not otherwise settled, a written grievance may be filed, and the dispute shall be referred immediately to arbitration. Should it be determined by an arbitrator that an abnormally unsafe or abnormally unhealthy condition within the meaning of this section existed, the Employee shall be paid for all earnings he lost, if any, as a result of his removing himself from his job. In those instances where it has been determined by an arbitrator that an Employee did not act in good faith in exercising his rights under the provisions of this Agreement, he shall be subject to appropriate disciplinary action, subject, however, to his right to file and process a grievance.
 
 
 [8]
 Windsor does not contend that it lost $45,000 per day. Its claim is that the 'amount of the Company's daily loss was established to be $6,625.0(0) per day . . ..' Brief for Appellee at 15
 
 
 [9]
 We note that the district court previously characterized these efforts as 'good faith affirmative action.'