SPINDELFABRIK SUESSEN–SCHURR, Stahlecker & Grill GmbH, Hans Stahlecker, and Fritz Stahlecker, Plaintiffs–Appellees,

v.

SCHUBERT & SALZER MASCHINEN-FABRIK AKTIENGESELLSCHAFT, and Schubert & Salzer Machine Works, Inc., Defendants–Appellants.

and

Appeal of RIETER HOLDING AG, Maschinenfabrik Rieter AG and Rieter Corporation, and any other entity owned or directly or indirectly controlled by Rieter Holding AG or any company effectively controlled by Rieter Holding AG.

Nos. 89–1624, 89–1625.

United States Court of Appeals, Federal Circuit.

May 17, 1990.

Charles B. Park, III, Bell, Seltzer, Park & Gibson, Charlotte, N.C., argued, for plaintiffs-appellees. With him on the brief were Joell T. Turner and Barbara K. Caldwell. Also on the brief was, Fletcher C. Mann, Leatherwood, Walker, Todd & Mann, Greenville, S.C.

William M. Grant, Jr., Grant & Leatherwood, Greenville, S.C., argued, for defendants-appellants. With him on the brief were, O.G. Calhoun, Judith A. Leatherwood, and Moffatt G. McDonald. Hugh A. Chapin, Kenyon & Kenyon, of New York City, argued, for appellants. With him on the brief was, John A. Fogarty, Jr. Also on the brief were, Lowell Gordon Harriss, Joan I. Greco, Guy T. Petrillo, Davis Polk & Wardwell, of New York City and Edward R. Cole, Drennan, Shelor, Cole & Evins, P.C., Spartanburg, Conn.

Before RICH and ARCHER, Circuit Judges, and FRIEDMAN, Senior Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

These appeals make various challenges to a judgment of the United States District Court for the District of South Carolina that, for the second time in this patent infringement case, held the defendants in contempt of the court's injunction and directed certain relief. *Spindelfabrik Suessen–Schurr Stahlecker & Grill v. Schubert & Salzer*, No. 83–2421–3 (D.S.C. June 15, 1989). We affirm in part and reverse in part.

## I

A. *The Infringement Suit and the Earlier District Court Decisions.* In 1983, Hans and Fritz Stahlecker and Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH, (collectively Suessen), German nationals and companies, filed suit for infringement of two U.S. patents (U.S. Patent No. 4,059,946 ('946) and U.S. Patent No. 4,175,370 ('370)) against the defendants Schubert & Salzer Maschinenfabrik AG (Schubert–Germany) and Schubert & Salzer Machine Works, Inc. (Schubert–U.S.) (collectively Schubert). As the district court stated in the present case, the patents "are directed to automated open-end rotor spinning machines for making textile yarns, and particularly to rotor spinning machines which have the capability of automatically 'piecing up' broken yarn ends during the spinning process." Order of June 15, 1989, at 2.

After trial, the court held that the patents were valid (*i.e.*, not proven invalid) and enforceable and that the defendants had willfully infringed them by selling their "Spincomat" spinning machines. The court enjoined the defendants from "manufacturing, using or selling in the United States their accused infringing 'Spincomat' automatic piecing device, or any other apparatus embodying any invention claimed in the '946 or '370 patent, and from otherwise infringing, or inducing others to infringe, the '946 or '370 patent in suit." Order & Opinion of Sept. 4, 1985, at 80.

A few days later, the defendants requested the court to authorize them to exhibit their model RU 14 "Spincomat" at an upcoming trade show in Greenville, South Carolina. They did not contend that their new model had been changed to avoid infringement; they argued only that since the trade show was an international event, they should be able to exhibit their product

to the non-U.S. attendees. The court denied permission, stating "[t]hat such a demonstration of the Spincomat would constitute infringement of the Plaintiff's patents, and thus violate the existing injunction." Order of Sept. 27, 1985.

The defendants then made two minor changes in the RU 14 "Spincomat" machine and exhibited it at the trade show. In response, the plaintiffs filed an emergency motion to enforce the injunction. After an evidentiary hearing, the court held that the changed RU 14 Spincomat continued to infringe the '946 patent. On October 23, 1985, the court ordered the defendants immediately to remove the infringing machines from the trade show, and "to further refrain from assembling, erecting, displaying, operating, using or otherwise exhibiting this automatic piecing device in any manner to customers, potential customers, or the public generally." Order of Oct. 23, 1985, at 2. In an order dated December 23, 1985, the court denied a stay pending appeal of the October 23, 1985 order.

In an appeal from those orders, the defendants challenged only the district court's finding of infringement. This court affirmed, holding that the district court's findings that the defendants had infringed both patents were not clearly erroneous. *Spindelfabrik Suessen–Schurr v. Schubert & Salzer*, 829 F.2d 1075, 4 USPQ2d 1044 (Fed.Cir.1987).

B. *The First Contempt Proceeding.* Shortly after this court's affirmance, the plaintiffs informed the district court that the defendants had continued to bring infringing RU 14 "Spincomat" machines into the United States. After another evidentiary hearing in October 1987, the district court found on November 16, 1987 that the additional modifications the defendants had made to the machines were insufficient to avoid infringement, and held the defendants in contempt. Order & Opinion of Nov. 16, 1987, at 7–8, 15. The court entered a further injunction and awarded additional damages, increased for willfulness, and attorney fees. *Id.* at 15–20.

In that evidentiary hearing, the court was informed that as of January 1987, Rieter Holding AG of Switzerland (Rieter–Holding) had acquired a substantial majority of the stock of the defendant Schubert–Germany. Rieter–Holding has a wholly-owned subsidiary, Maschinenfabrik Rieter AG of Switzerland (Rieter–Swiss), which in turn has a wholly-owned subsidiary, Rieter Corporation of Spartanburg, South Carolina (Rieter–U.S.) (collectively Rieter). The court also was informed that the sales and service functions of Schubert–U.S. had been taken over by Rieter–U.S. as of about April 1987, and that the defendants had transferred some of Schubert–U.S.'s key personnel to Rieter–U.S. *See* Order of June 15, 1989, at 4–5.

Because of this information, the district court made certain findings concerning the Rieter companies and named Rieter–U.S. in certain of the injunctive provisions in the November 16, 1987 order. For example, the court ordered the defendants to:

> Take out of operation, disassemble and export from the United States all "Spincomat" automatic piecing devices located in the United States which are under the direct or indirect control of either of the defendants, or those in active participation or concert with defendants, including specifically, but without limitation, Rieter Corporation of Spartanburg, South Carolina;....

Order & Opinion of Nov. 16, 1987, at 19.

At the time of the November 16, 1987 order, no Rieter company was a party to the suit. On December 11, 1987, however, Rieter–Swiss and Rieter–U.S. moved to intervene in the suit, in order to appeal from that order. Simultaneously, they filed a separate declaratory judgment action in the same court against the plaintiffs seeking to enjoin them from enforcing against the Rieter companies the injunctive provisions of that court's November 16, 1987 order. *Rieter Corp. v. Spindelfabrik Suessen–Schurr*, No. 6:87–3298–3 (D.S.C.). The Rieter companies contended that they were authorized to engage in the enjoined conduct under a November 11, 1981 patent license agreement (the Rockford Agreement, discussed below) between Rieter–Swiss and the plaintiff Suessen.

In an April 21, 1988 order, the district court (1) denied "without prejudice to renewal when, if, and as necessary in the future," the Rieter companies' motion to intervene, (2) modified the November 16, 1987 order to eliminate all references to the Rieter companies, and (3) indicated that "[n]othing in [the November 16, 1987 order] shall be construed to enjoin [Rieter–Swiss] or [Rieter–U.S.] or their customers from any activity authorized by the Rockford Agreement." Order & Opinion of Apr. 21, 1988, at 5. The court explained:

> The pertinence of the particulars and scope of the patent license granted by Suessen in the Rockford Agreement was not brought to this Court's attention by any of the parties to this action, prior to November 16, 1987. This Court would *not* have referred to Rieter Swiss and Rieter U.S. in the November 16th Order, thereby depriving Rieter Swiss and its customers of the benefits of the patent license granted by Suessen in the Rockford Agreement, had this Court been fully advised in the premises.
>
> Further, neither Rieter Swiss nor Rieter U.S. were properly before this Court in the contempt proceeding giving rise to the Order of November 16, 1987. As a result, neither Rieter interests nor the pertinence of the Rockford Agreement were appropriately recognized and protected by this Court.
>
> For the foregoing reasons Rieter U.S. and Rieter Swiss should not be included in the November 16, 1987 Order of this Court. Neither of those companies should be limited by that Order in any respect while operating under the terms of the Rockford license.

*Id.* at 4 (emphasis in original). In a footnote, the court stated that by those modifications it "in no way passe[d] on the validity or effect of Plaintiff's attempted unilateral termination of the Rockford license. The Court merely want[ed] to make it clear that the November 16, 1987 Order does not apply to any entity operating under the provisions of a valid licensing agreement." *Id.* at 4 n. 2.

This court affirmed the district court's order holding the defendants in contempt.

*Spindelfabrik Suessen–Schurr v. Schubert & Salzer*, 865 F.2d 268, 9 USPQ2d 1743, 1745–46 (1988).

*C. The Present Contempt Proceeding.* Following another complaint by the plaintiffs that the defendants continued to market their infringing "Spincomat" machines in the United States, the district court issued to the defendants an order to show cause why they should not again be held in contempt. Although the court encouraged the defendants to bring the Rieter companies into the case, those companies declined to appear or otherwise participate.

After a further evidentiary hearing, in an order dated June 15, 1989, the one now on appeal, the court once again found the defendants in contempt of court for marketing in the United States their "Spincomat" machines. The court found that "[t]he evidence presented by plaintiffs clearly and convincingly shows that at least six RU 14 'Spincomat' machines were delivered to a U.S. customer during the period late 1988–spring 1989, and that such machines infringe Claim 18 of the '946 patent here in suit." Order of June 15, 1989, at 9. The court noted that the defendants admitted that the machines were delivered and did not claim that these had been changed to avoid infringement. The defendants' only defense was that "their machines are now being marketed in the United States by the Rieter companies who have immunity from suit under the '946 patent by reason of the Rockford license from Suessen to Rieter–Swiss, and that accordingly, they (the defendants) do not stand in contempt." *Id.*

A major portion of the district court's lengthy opinion dealt with the Rockford license, upon which the defendants relied as a justification for their infringing activities, and the validity of Suessen's unilateral termination of that license. The facts relating to the license and its termination, as found by the district court and not here challenged by the defendants, are as follows.

In the mid–1960's, defendant Schubert–Germany, Rieter–Swiss, and Platt of England joined together in a consortium to

develop open-end rotor spinning machines and share patents related thereto. In 1975, the three jointly filed suit in the United States District Court in Rockford, Illinois, against Suessen and its then American licensee, Barber–Colman Company, charging infringement of a Platt patent. Suessen and Barber–Colman filed a counterclaim alleging that the members of the consortium had violated the antitrust laws.

Suessen entered into separate settlements with each plaintiff. First, Platt licensed Suessen under the patent Suessen was accused of infringing, and Suessen dropped its antitrust claim against Platt.

Second, in 1981 Suessen and Rieter–Swiss cross-licensed each other under their patents, and Suessen dismissed its antitrust claim against Rieter–Swiss. Rieter–Swiss gave Suessen a nonexclusive, worldwide license under all of its patents in the field of open-end spinning, and Suessen gave Rieter–Swiss a nonexclusive worldwide license under only its patents covering automation for open-end spinning (which included the '964 patent), but not under its patents for spinbox technology. At that time, both Rieter–Swiss and Suessen held many patents covering open-end spinning. Rieter's patents related principally to spinbox technology, while Suessen's patents related to both spinbox and automation technology. Although Rieter tried to obtain a license under both technologies, Suessen would grant a license only for either the spinbox or the automation technology, but not for both.

The agreement provided that Rieter–Swiss "shall not give any voluntary support or assistance to any third party in any suit or proceeding (a) in which Suessen, [Barber–Colman], or Schlafhorst is a party and (b) which suit or proceeding substantially concerns or involves the field of rotor spinning,...." *License Agreement between Rieter–Swiss and Suessen,* ¶ 1.4.

Finally, Suessen and Schubert–Germany cross-licensed each other and Suessen dismissed its antitrust claim against Schubert–Germany. Suessen licensed Schubert–Germany only for its spinbox and not its automation technology.

Effective March 17, 1988, Suessen unilaterally terminated its license to Rieter–Swiss. The ground was that Rieter–Swiss had violated its agreement not to assist any third party in a suit in which Suessen was a party through the aid Rieter–Swiss had given to Schubert in this case.

The district court in its June 15, 1989 order held (1) that the Rockford agreement did not justify Schubert's sale of its infringing Spincomat machines in the United States and (2) that Suessen justifiably unilaterally terminated its license to Rieter–Swiss.

The court pointed out that the defendants' justification for their conduct was a 1987 marketing agreement between Schubert–Germany and Rieter–Swiss, which they made shortly after our decision in the first appeal that upheld the district court's findings of infringement. The agreement, which stated that "[f]or patent reasons, the Spincomat RU 14 can no longer be marketed by Schubert & Salzer in USA," provided that Schubert–Germany would sell machines destined for the United States to Rieter–Swiss, blindly and at full price, and that Rieter–Swiss in turn would sell the machines in the United States. The defendants contended that "those machines are not 'unlicensed' machines under the outstanding injunction, but instead, are licensed machines coming within the license 'to have made' and 'to sell' granted Rieter–Swiss in the Rockford license, which license, they assert, is still in force notwithstanding plaintiffs' efforts to unilaterally terminate the same." Order of June 15, 1989, at 11.

The court found that:

Quite apart from the issue of whether the Rockford license has been terminated, ... the charade being employed by defendants to supply their machines to the United States does not in fact or law constitute any legitimate exercise of any rights afforded to anyone under that license. More specifically, the evidence shows that defendants make the infringing machines for a specific American mill customer whose name and location are known to defendants at the out-

set. Those machines are then shipped from a German port marked with that customer's name and location, CIF a specified U.S. port close to such customer. Then, defendants dispatch their own personnel from Germany to the American customer's mill to erect and start up those infringing machines *in situ.*

*Id.*

The court further found that although the sale of the machines "[o]stensibly" "is handled exclusively by Rieter–U.S. who holds itself out as the exclusive U.S. distributor for machinery made by members of the 'Rieter Group,'" Schubert–Germany "holds itself out as a member of that 'Rieter Group,'" and the conclusion is inescapable that Rieter–U.S. simply acts as Schubert & Salzer's sales agent." *Id.* at 11–12. The court found that although Schubert–U.S., "the former sales agent, has been reportedly dissolved, its key personnel, including its sales manager, were simply transferred to Rieter–U.S." *Id.* at 12. The court also found that although the "Rieter name is also placed in bumper-sticker fashion on the infringing machines," Schubert's well-known trademarks "continue to be used on the machines." *Id.*

The court concluded that "the scheme being employed by Schubert & Salzer (Germany) to market the offending machines in the United States under [the] umbrella of some alleged right under the Rockford license is, in fact, nothing more than a subterfuge conceived and put into practice for the sole purpose of attempting to evade the letter of this Court's injunction while totally violating the spirit thereof." *Id.* at 12–13.

The court also held that because the Rockford license from Suessen to Rieter–Swiss was expressly both nonexclusive and nontransferable, Schubert acquired no rights under that license. *Id.* at 13. The court concluded that "Rieter–Swiss cannot, as a matter of law, pass to the Schubert & Salzer defendants any freedom from suit or freedom from the provisions of this Court's outstanding Orders which Rieter–Swiss might be entitled to derive from the Rockford license, regardless of the com-mon control or other relationship of these companies afforded by stock ownership." *Id.* at 16.

Finally, the court held that Suessen's unilateral termination of the Rockford license to Rieter–Swiss was justified because Rieter–Swiss breached its "duty of good faith and fair dealing which it owed to Suessen as a party to the Rockford license," *id.* at 24, and also breached its contractual obligation "to refrain from assisting anyone else, including Schubert & Salzer, in litigation involving Suessen in the field of open-end spinning. The Court finds that Rieter–Swiss has assisted Schubert & Salzer in multiple respects in this litigation, and that, by so doing, Rieter–Swiss has materially breached the Rockford license." *Id.* at 25.

The court held that because of the defendant's "flagrant contemptuous conduct," it was "necessary to impose additional injunctive relief in order to secure future compliance with its Orders." *Id.* at 34, 36. The court further found it "appropriate to expressly name the Rieter companies in the additional injunctive provisions." *Id.* at 37.

The court ordered

[t]hat defendants and their respective officers, directors, agents and employees, and all those in active concert or participation therewith, shall forthwith refrain from directly or indirectly engaging in any activity which in any way relates to the manufacture, sale, use, servicing, exhibition, demonstration, promotion or commercialization of any automated rotor spinning machines, either in the United States or for use in the United States, whether such activity is engaged in alone or in conjunction with any other person or entity, including any entity owned or directly or indirectly controlled by Rieter Holding AG or any company effectively controlled by Rieter Holding AG.

*Id.* at 39–40, ¶ 2. The order stated that "[t]hese restrictions shall not apply to servicing and supplying spare parts for those specifically identified machines dealt with" in a previous order of the court. *Id.* at 40.

The order also provided

[t]hat if, in the future, defendants so substantially redesign an automated

open-end spinning machine in such a way that they have a good faith belief that they can clearly and convincingly show that the changes therein are so significant that such redesigned machine does not infringe any of the adjudged infringed U.S. patents, then, in such event, defendants shall, prior to engaging in any activity enjoined by this Court's Orders, make application in verified form to this Court for relief from the [above discussed provision]. In any such application for relief, defendants shall set forth full details of their redesigned machine and shall verify that they have made such machine together with relevant technical documentation fully available to plaintiffs at a convenient location outside the United States for their inspection, testing and comment to this Court prior to any ruling by the Court on the application for relief.

*Id.* at 41, ¶ 5.

The order required the chief executive officer of defendant Schubert–Germany to "file with th[e] [c]ourt within 10 days following the end of each calendar quarter an appropriate statement under oath certifying that, based upon his individual investigation of all relevant information available to the defendants, all Orders entered in this action have all been fully complied with." *Id.* at 41–42, ¶ 6.

Finally, the court concluded that

because of the flagrant and contemptuous conduct exhibited by defendants in their repeated refusal to comply with the Court's Orders, the .Court now finds it necessary and appropriate to ensure future compliance with its Orders by the imposition upon defendants of a civil fine in the amount of two million U.S. dollars (U.S. $2,000,000) to be paid to plaintiffs....

*Id.* at 42, ¶ 8.

The court stated that "in its discretion" it "chooses not to treat defendants, [sic] contempt as criminal. However, defendants are admonished that should another instance of violation conduct in the matter arise, then the Court will be moved to consider the violation to be criminal in nature." *Id.* at 39.

## II

Schubert challenges (A) the district court's findings that Schubert violated the court's prior injunctions and therefore was in contempt, and (B) the additional injunctive and other relief and the $2 million fine the court ordered to insure future compliance with its orders.

A. The district court found—and Schubert does not challenge the findings—that at least six infringing RU 14 Spincomat machines were delivered to a United States customer in 1988–89. Schubert's defense is that the delivery of the machines was in accordance with a business plan of Schubert–Germany and Rieter–Swiss that the district court had approved in its April 21, 1988 order.

██ The district court found that the sale of the six machines was not made in accordance with the business plan. Although the plan provided that Schubert–Germany would have no part in Rieter–Swiss's sale of the machines in the United States and would sell the machines blindly to Rieter–Swiss, the court found that Schubert–Germany made "the infringing machines for a specific American mill customer whose name and location [were] known to the defendants at the outset," and that the machines were "then shipped from a German port marked with the customer's name and location, CIF a specified U.S. port close to such customer." The court further found that the Schubert defendants "dispatch[ed] their own personnel from Germany to the American customer's mill to erect and start up those infringing machines *in situ.*" *Id.* at 11. These findings are not clearly erroneous, and they support the district court's ultimate finding that because the business plan was not followed, the sale of the machines was not made pursuant to the plan.

Furthermore, the record does not support Schubert's contention that the court's April 21, 1988 order approved the business plan. In that order, the court merely deleted from its prior November 16, 1987 injunc-

tion the references to the Rieter companies, and stated that "[n]othing in [the November 16, 1987 Order] shall be construed to enjoin [Rieter–Swiss] or [Rieter–U.S.] or their customers from any activity authorized by the Rockford Agreement." Order & Opinion of Apr. 21, 1988, at 5, ¶ 3. The court explained that it thus modified the November 16, 1987 injunction because "[n]either of those companies [Rieter–Swiss and Rieter–U.S.] should be limited by that Order in any respect while operating under the terms of the Rockford license." *Id.* at 4.

The order related only to the Rieter companies, not to Schubert. Nothing in the order determined whether the Rockford Agreement authorized Schubert to sell the infringing machines in the United States or whether Suessen's unilateral termination of the agreement was valid. To the contrary, the court stated that it "in no way passe[d] on the validity or effect of Plaintiff's attempted unilateral termination of the Rockford license. The Court merely want[ed] to make it clear that the November 16, 1987 Order does not apply to any entity operating under the provisions of a valid licensing agreement." *Id.* at 4 n. 2.

■ Schubert does not challenge the merits of the district court's rulings that the Rockford Agreement did not authorize Schubert's infringing activities and that Suessen's unilateral termination of that agreement was valid. Instead, it contends only that those issues were not properly before the district court in the contempt proceeding, and that in any event they did not have adequate notice that the court would decide the issues.

The questions whether the Rockford license justified what otherwise would have been infringing conduct by Schubert and whether Suessen's unilateral termination of the license was valid have been in the case for a considerable time. These were two of Schubert's principal defenses in the current contempt proceedings, which the district court instituted with an order to show cause in the Spring of 1988.

On December 11, 1987, in the suit they filed for a declaratory judgment, the Rieter companies had informed the district court about the Rockford license agreement and contended that that agreement authorized them to engage in the conduct from which they were enjoined by the district court's November 16, 1987 order. The district court discussed the Rockford license in its April 21, 1988 order that modified its prior order to eliminate all references to the Rieter companies, to make clear that its prior order "does not apply to any entity operating under the provisions of a valid licensing agreement." Order & Opinion of Apr. 21, 1988, at 4 n. 2. In that order, the district court also stated that it had not decided "the validity or effect of" Suessen's "attempted unilateral termination of the Rockford license." *Id.*

Since both the effect of the Rockford license itself and the validity of Suessen's unilateral termination of it were key elements of Schubert's defense to the contempt charge that the importation of the infringing machines was permissible under the Rockford license, it is difficult to comprehend how Schubert can assert that those issues were not properly involved in the contempt proceeding. Those issues had been raised before the present contempt proceeding had been instituted, and they were in that proceeding from the outset because the Rockford license was a major part of Schubert's defense. The district court acted well within its authority and discretion in determining those issues as part of the contempt proceeding.

■ Schubert contends that the district court improperly placed on it the burden of proving that its actions were justified by the Rockford license. The license, however, was asserted as a defense to what otherwise would be infringement. As the proponents of the defense, it was incumbent upon Schubert to show that the license authorized the sale of the infringing machines in the United States. We do not read the court's comments, upon which Schubert relies, as requiring Schubert to establish that Suessen's termination of the license was improper.

■ B. 1. The district court concluded that in light of Schubert's "flagrant contemptuous conduct," Order of June 15, 1988, at 34, which, it noted, marked "the fourth time that defendants appear before this Court by reason of continually engaging in enjoined activity with regard to adjudged infringing automatic open-end rotor-spinning machines," *id.* at 1, it was "necessary to impose additional injunctive relief to secure future compliance with its Orders." *Id.* at 36.

The court's prior injunction prohibited the sale in the United States of Schubert's "adjudged infringing 'Spincomat' automatic piecing device, any colorable imitation thereof, or any other apparatus covered by Claim 18 of U.S. Patent No. 4,059,946 or any of Claims 1–7, 9–13 and 17–20 of U.S. Patent No. 4,175,370." Order of Apr. 21, 1988, at 16–17, ¶ 2(a). The broadened injunction prohibited Schubert from "directly or indirectly engaging in any activity which in any way relates to the manufacture, sale, use, servicing, exhibition, demonstration, promotion or commercialization of any automated rotor spinning machines, either in the United States or for use in the United States...." Order of June 15, 1989, at 39, ¶ 2. The order also required that Schubert "immediately cancel all pending orders in their possession for automated rotor spinning machines destined for delivery to the United States," *id.* at 40, ¶ 3, and "prominently include" "in all advertising materials, promotional literature, brochures, press releases and the like which relate in any way to any automated rotor spinning machines manufactured by or with the assistance or participation of defendants, or either of them," a notice that the machine was "not available for sale or use in, or delivery to the United States," *id.* at 40–41, ¶ 4.

The order further provided that if in the future the defendants "so substantially redesign an automated open-end spinning machine in such a way that they have a good faith belief that they can clearly and convincingly show that the changes therein are so significant that such redesigned machine does not infringe any of the adjudged infringed U.S. patents," the defendants,

"prior to engaging in any activity enjoined by this Court's orders, [shall] make application in verified form to this Court for relief from the [pertinent] provisions of [the decree]. In any such application for relief, defendants shall set forth full details of their redesigned machine and shall verify that they have made such machine together with relevant technical documentation fully available to plaintiffs at a convenient location outside the United States for their inspection, testing and comment to this Court prior to any ruling by the Court on the application for relief." *Id.* at 41, ¶ 5. Further, the court required that the chief executive officer of Schubert–Germany file with the court quarterly sworn statements "certifying that, based upon his individual investigation of all relevant information available to the defendants, all Orders entered in this action have been fully complied with." *Id.* at 41–42, ¶ 6.

The defendants' repeated and "flagrant" violations of the district court's earlier injunction fully justified these broad provisions. By the time of this second contempt adjudication, the district court had ample basis for concluding that the more traditional and narrower forms of injunctive relief it previously had used were not adequate to stop the violations. The district court did not abuse its discretion in broadening the injunction to cover "any automated rotor spinning machine," without the qualifying word "infringing." Similarly, in view of the defendants' sale of machines with minor modifications that did not avoid infringement, it was not unreasonable for the court to require that before the defendants attempted sales of other modified machines, they first must obtain the district court's permission. These stringent provisions of the decree reflect the old adage that "those caught violating the [law] must expect some fencing in." *Federal Tr. Comm'n v. Nat'l Lead Co.*, 352 U.S. 419, 431, 77 S.Ct. 502, 510, 1 L.Ed.2d 438 (1957).

■ Schubert argues that because its Spincomat machines are all manufactured in Germany, the injunction impermissibly extends the reach of American patent law beyond the boundaries of the United States

by applying its prohibitions to those machines. The requirements to which Schubert objects, however, apply only to machines "in the United States or for use in the United States," Order of June 15, 1989, at 39–40, ¶ 2, or which are "destined for delivery to the United States," *id.* at 40, ¶ 3. The notice requirement similarly requires the statement that the machine "is not available for sale or use in, or delivery to, the United States...." *Id.* at 40–41, ¶ 4. These provisions are a reasonable and permissible endeavor to prevent infringement in the United States and not a prohibited extra-territorial application of American patent law. They were well within the district court's authority.

■ 2. Schubert next challenges the district court's award of treble damages and attorney fees. The district court trebled the damages "by reason of the willful and deliberate nature of the infringement," and awarded attorney fees "by reason of the exceptional nature of the case." *Id.* at 34. In the prior contempt proceeding, the district court also awarded increased damages and attorney fees. Thus, the damages here awarded were for the additional infringements upon which the finding of contempt rested—the importation of the six Spincomat machines—and the attorney fees were for attorney services rendered to Suessen in the present contempt proceeding.

As we have shown, the court justifiably characterized Schubert's actions as "flagrant contemptuous conduct." *Id.* at 34. In these circumstances, the district court did not abuse its discretion in trebling the damages and awarding attorney fees.

■ 3. Finally, Schubert contends that the $2 million civil fine the court imposed, to be paid to Suessen, was improper because the fine was a penalty imposed as punishment for criminal contempt and the district court did not follow the procedures required for a criminal contempt conviction. We agree.

The distinction "between civil and criminal contempt lies in 'what ... the court primarily seek[s] to accomplish by imposing sentence' in the proceedings." *Carbon*

*Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1349 (4th Cir.1975) (quoting *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966)). A civil contempt sanction "is remedial, and for the benefit of the complainant" while a criminal contempt sentence "is punitive, to vindicate the authority of the court." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). *See also Penfield Co. v. Sec. & Exch. Comm'n*, 330 U.S. 585, 593, 67 S.Ct. 918, 922, 91 L.Ed. 1117 (1947); *Carbon Fuel Co.*, 517 F.2d at 1349.

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss...." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 701–02, 91 L.Ed. 884 (1947) (citation and footnote omitted).

The Fourth Circuit, the decisions of which on this issue we follow, has held that a contempt proceeding is civil if the penalty is intended "to coerce compliance with an order of the court or to compensate for losses or damages caused by noncompliance." *Windsor Power House Coal Co. v. District 6 United Mine Workers of Am.*, 530 F.2d 312, 316 (4th Cir.1976) (quoting *Carbon Fuel*, 517 F.2d at 1349).

Although a fine payable to the court normally is "punitive" it "is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order." *Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 1430, 99 L.Ed.2d 721 (1988). *See also United States v. Darwin Constr. Co., Inc.*, 873 F.2d 750, 754 (4th Cir.1989).

■ The ability of the contemnor to avoid the sanction by complying with the court order is an important factor in determining whether a contempt adjudication is

civil or criminal. "[T]he judgement for civil contempt is conditional in nature and can be terminated if the contemnor purges himself of the contempt." *De Parcq v. United States Dist. Ct. for S. Dist. of Iowa,* 235 F.2d 692, 699 (8th Cir.1956). A coercive penalty is forward-looking and "terminable if the contemnor purges himself of the contempt...." *Windsor Power,* 530 F.2d at 316.

On the other hand, because criminal contempt is intended to vindicate the authority of the court, it cannot be purged by any act of the contemnor. *Nye v. United States,* 313 U.S. 33, 43, 61 S.Ct. 810, 813, 85 L.Ed. 1172 (1941); *Carbon Fuel Co.,* 517 F.2d at 1349. "It is 'unconditional, since it penalizes yesterday's defiance rather than seeking to coerce tomorrow's compliance. It cannot be ended or shortened by any act by defendant.'" *Carbon Fuel Co.,* 517 F.2d at 1349 (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure* 585, § 2960). *See also Shillitani v. United States,* 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966).

Where the sanction for civil contempt is imprisonment, the contemnor can avoid the sanction by complying with the court's order. In the oft-quoted phrase, in that situation the contemnors "carry 'the keys of their prison in their own pockets.'" *Shillitani,* 384 U.S. at 368, 86 S.Ct. at 1534 (quoting *In re Nevitt,* 117 Fed. 448, 461 (8th Cir.1902)). Where the sanction is a fine designed to secure compliance, however, the contemnor in a civil contempt can avoid the sanction by "comply[ing] with the court's order." *Id.* at 371.

The fact that the $2 million fine in the present case is to be paid to the contempt complainant Suessen suggests that the fine is compensatory and the contempt thus civil. *Darwin Constr. Co.,* 873 F.2d at 754. The amount of the fine, however, was not "based upon evidence of [Suessen's] actual loss." *United Mine Workers,* 330 U.S. at 304, 67 S.Ct. at 701.

To the contrary, the court here stated that in determining the amount of the fine, it considered that "this is the fourth instance since the original injunction was entered in which defendants' violative conduct has come to the attention of the Court—a fact that demonstrates defendants' propensity for continuing to ignore this Court's orders"; and that although Schubert had twice been given substantial fines for contempt by German courts "in related litigation," "the amounts of these fines have not served as a sufficient deterrent to abate defendants' contemptuous conduct in Germany."

The court stated it had "considered defendants' most recent annual financial report for the purposes of trying to ascertain a fine amount which would under these circumstances serve as a true deterrent. This report shows that defendants had the equivalent of over two hundred million U.S. dollars in sales volume in the past fiscal year and has set aside a contingency reserve for patent infringement liability of the equivalent of more than twenty million U.S. dollars. In view of this substantial sales volume ... and this contingency reserve the Court in its discretion deems it appropriate to set the civil fine at two million U.S. dollars (U.S. $2,000,000)" (citation omitted).

The purpose of the fine, therefore, was to "serve as a true deterrent," *i.e.,* to discourage Schubert from future violations. Suessen will be compensated for the injury it suffered from the infringements upon which the present contempt adjudication is based by the award of treble damages for those infringements.

The $2 million fine is unconditional. Nothing Schubert can do will result in remission of the fine. To the contrary, the court indicated that the large fine was intended to "serve as a true deterrent" against future violations.

This is not a situation where the fine is "condition[ed] on the defendant's failure to purge itself within a reasonable time," *United Mine Workers,* 330 U.S. at 305, 67 S.Ct. at 702, or where the fine would be remitted if the defendant did not further violate the court's order for a stated period, *Consolidation Coal Co. v. Local 1702, United Mineworkers of Am.,* 683 F.2d 827, 830 (4th Cir.1982) ("[T]he judge indicated

that any retrospective effect of the fines might be lifted if the workers returned to work immediately."). If in the present case, for example, the court had provided that the $2 million fine would be remitted if Schubert committed no further violations of the injunction for a specified period, *Consolidation Coal,* 683 F.2d at 830, or if the court had provided for a specified fine in the event Schubert further violated the injunction, *Darwin Constr.,* 873 F.2d at 754 ($5000 fine conditioned on continued noncompliance), it would be a quite different situation.

What we have here, however, is a $2 million fine not subject to remission. Its purpose is not to coerce the contemnor to take action the court previously had ordered it to take, as in most coercive civil contempt sanctions. Instead, it is designed to deter Schubert from future additional violations of the injunction. However, most criminal punishment is intended, among other things, to deter the criminal from committing other crimes.

■ We conclude that the $2 million fine was not imposed for civil contempt because (1) although paid to Suessen, it was not compensatory and (2) it was not coercive, since Schubert could not avoid it by complying with the court's order. The district court's description of the fine as civil is not controlling in determining the character of the contempt. *United States v. Powers,* 629 F.2d 619, 626 (9th Cir.1980). *See Carbon Fuel Co.,* 517 F.2d at 1350; *In re Jaques,* 761 F.2d 302, 305 (6th Cir.1985); *Lewis v. S.S. Baune,* 534 F.2d 1115, 1119 (5th Cir.1976). The fine constituted punishment for criminal contempt, and cannot stand because it was imposed without following the requisite procedures for criminal contempt. Our reversal of the fine, however, does not preclude the district court from now assessing a new civil penalty that will be compensatory or have the necessary coercive effect while at the same time enabling Schubert to avoid the penalty by compliance with the court's orders.

## III

■ In their separate appeal, the Rieter companies contend that the district court improperly issued an injunction against them in violation of due process because they were not parties to this action. They also argue that the district court's rulings on the application of the Rockford license to Schubert's infringements and the validity of Suessen's unilateral termination of that license were erroneous.

A. The only provision of the order that specifically refers to the Rieter companies is paragraph 2. This is the general injunction against manufacturing for sale in the United States or for the use in the United States of "any automated rotor spinning machines." The injunction, however, runs against only the "defendants and their respective officers, directors, agents and employees, and all those in active concert or participation therewith." The "defendants" do not include the Rieter companies, which are not parties in this case. Thus, the order does not explicitly direct the Rieter companies to do or to refrain from doing anything.

The only reference to the Rieter companies in this provision is the statement that the injunction against the "defendants'" engaging in the prohibited activity applies "whether such activity is engaged in alone or in conjunction with any other person or entity, including any entity owned or directly or indirectly controlled by Rieter Holding AG or any company effectively controlled by Rieter Holding AG." That language, however, does not make the injunction directly applicable to the Rieter companies. It merely indicates that the injunction covers the prohibited conduct whether done by Schubert alone or in conjunction with the Rieter companies and their affiliates.

Although the order also includes the provision that the injunction runs against those "in active concert or participation" with the defendants, *cf.* Fed.R.Civ.Proc. 65(d), "a nonparty [like the Rieter companies] with notice cannot be held in contempt until shown to be in concert or participation" with a defendant. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 112, 89 S.Ct. 1562, 1570, 23

L.Ed.2d 129 (1969). As long as the Rieter companies do not act "in concert or participation" with Schubert, they cannot be held in contempt for any future violations of the injunction that Schubert may commit. The Rieter companies have not shown any basis for modifying the injunction.

■ B. Since the Rieter companies are not parties in this case, they have no standing to appeal the judgment against Schubert or to argue, as they do, that the district court erred in holding that the Rockford license did not authorize Schubert's infringements and that Suessen's unilateral termination of that license was improper. *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1582 n. 14, 230 USPQ 81, 92 n. 14 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987) ("Having neither intervened before the trial court nor argued that Stora is incapable of contesting the merits on appeal, Kloster is without standing to appeal from the judgment on the merits."). The naming of the Rieter companies in the injunction, therefore, would not make those rulings *res judicata* or give them collateral estoppel effect against the Rieter companies in any proceeding in which they are a party. *See Lynch v. Merrell–Nat'l Lab.,* 830 F.2d 1190, 1192 (1st Cir.1987); *Flanzbaum v. M & M Transp. Co.,* 286 F.2d 500, 503 (2d Cir.1961).

## CONCLUSION

The judgment of the district court is reversed insofar as it imposed a $2 million civil penalty for contempt; it is affirmed in all other respects.

## COSTS

No costs.

AFFIRMED IN PART and REVERSED IN PART.